# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### March 20, 2012 Session

## MARIE McPEAKE v. EDNA DICKSON and BRIDGETTE COLLETTE DICKSON
## AND
## DANNY DICKSON and wife, VICKIE DICKSON v. MARIE McPEAKE

### Direct Appeal from the Chancery Court for Henderson County
### No. 21281     James F. Butler, Chancellor

### No. W2011-01127-COA-R3-CV - Filed April 26, 2012

This appeal arises out of a four-day trial over a boundary line dispute. Numerous surveyors and other witnesses testified at trial, and many maps, aerial photographs, survey plats, deeds, and other documents were entered into evidence. The chancellor personally viewed the property in question as well. Thereafter, the court established the boundary line as set forth in the survey plat prepared by the defendants' surveyor. The plaintiff contends that this was error. We affirm.


**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Carthel L. Smith, Jr., Lexington, Tennessee, for the appellant, Marie McPeake

Laura A. Keeton, Huntingdon, Tennessee, for the appellees, Edna Dickson, Bridgette Collette Dickson, Danny Dickson and Vickie Dickson

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Marie McPeake purchased a 75-acre tract of land near the Life community in Henderson County, Tennessee in 1993. The property to the south of the 75-acre tract had been owned by Edna Dickson since 1946. The common boundary line between the two properties was described in basically the same manner in both parties' deeds. Beginning at the boundary line's east end, the boundary line was to run "westward with the meanders of" a road, now known as Sheppard Road, for a distance of about 80 poles until the road intersected a small farm road. At that point, the boundary line would run south with the farm road for about 8 to 10 poles, then the boundary line would continue running westward about 55 to 60 poles to its west end.[1] Mrs. McPeake's property lay to the north of the line, and Mrs. Dickson's property lay to the south.

A dispute arose around 2006, when Edna Dickson conveyed a lot of approximately one acre to her granddaughter, Bridgette, who began to clear the lot in order to build a house there. Mrs. McPeake then filed a complaint in the chancery court of Henderson County against Edna Dickson and Bridgette Dickson, seeking to have the Dicksons enjoined from encroaching on the disputed property and seeking to have the boundary line established by the court. Mrs. McPeake alleged that she is the legal owner of the disputed property, but in the alternative, she claimed that she owned the property by virtue of adverse possession pursuant to Tenn. Code Ann. § 28-2-101, et seq.

Edna Dickson and Bridgette Dickson filed an answer and counterpetition, in which they claimed ownership of the disputed property and requested that the court declare the true boundary line. They alleged that Mrs. McPeake had cut timber from Edna's land and interfered with Bridgette's use of her land, entitling each of them to an award of damages. The Dicksons also sought an injunction preventing Mrs. McPeake from interfering with construction on the disputed property. The Dicksons' counter-petition stated that it was also joined by Bridgette's parents, Danny and Vickie Dickson, as third-party plaintiffs, as they also owned property affected by the disputed boundary line.

---

[1] The deed descriptions of the common boundary line can be traced back to 1946, when a common grantor conveyed the 75-acre tract to one of Mrs. McPeake's predecessors in title and conveyed 185 acres to Mrs. Dickson and her now deceased husband. The deed descriptions use general directions, such as westward or south. The distances are measured in "poles," and the measurements are preceded by the word "about," *e.g.*, "about 80 poles." One pole equals 16.5 feet. There were some slight differences in the distances stated in the two deed descriptions, as, for example, one called for 8 poles down the farm road, and the other called for 10 poles, which is a difference of 33 feet.

On May 3, 2007, the chancellor entered an order stating that the parties had reached an agreement to be mutually enjoined from changing the character of the disputed property. Mrs. McPeake filed a motion requesting that the chancellor go to the location of the disputed property to view the same in order to assist the court in its determination of the issues. An agreed order was subsequently entered on this matter, stating that the parties had agreed for the chancellor to personally view the disputed area. After several continuances, the case was finally tried over the course of four non-consecutive days in late 2009 and early 2010.

As previously noted, Mrs. McPeake's property lies to the north of the disputed boundary line, and the Dickson property lies to the south. The parties' deeds basically called for the eastern half of the common boundary line to run with Sheppard Road.[2] Although it has some curves, Sheppard Road generally runs in an east/west direction. Thus, on the eastern half of the disputed boundary line, Mrs. McPeake's property would lie north of Sheppard Road, and the Dickson property would lie south of Sheppard Road, according to the deeds. Mrs. McPeake's position in this lawsuit is that a portion of Sheppard Road was relocated further north at some point after the deeds from the common grantor were written in 1946. As a result, Mrs. McPeake contends, a portion of her property now lies south of the existing Sheppard Road.

At trial, Mrs. McPeake presented the testimony of Jessica Reddin, who served as the 911 Director for nearby Chester County. Ms. Reddin held a bachelor's degree in Geographic Information System Mapping, and she testified that she was trained to locate roads using aerial photography. Ms. Reddin testified that her office maintains aerial photographs of neighboring counties, including Henderson County, and that she was able to locate some aerial photographs of the area in dispute. One of those aerial photographs was from 2007, and Ms. Reddin identified Sheppard Road on the photograph as a paved road. However, she also stated that another road could be seen in the photograph, which she described as "the old road where it used to be." Ms. Reddin said she could see where the old road started, then continued through an area where the tree line had been cut, and she said the ground looked different where the old road had been located. Ms. Reddin testified that the electric power lines now follow along the old roadbed. Ms. Reddin also produced another aerial photograph that was older than the 2007 photo, although she did not state when the second photo was taken. Ms. Reddin said that she could identify both roads in this photo as well, in "the exact same" location as the previous photograph. On cross examination, Ms. Reddin conceded that she had no personal knowledge of whether the old road she described was the old Sheppard Road, stating, "I was told that."

_____

[2] It is undisputed that Sheppard Road has in the past been referred to as the Mifflin and Saltillo Road, Sheppard Schoolhouse Road, and other slight variations of these names. For clarity, we will refer to the road simply as Sheppard Road in this opinion.

-3-

Next, Mrs. McPeake presented the testimony of Darrell Beckham, who was employed as senior crew chief for Reasons Engineering & Associates, the company hired by Mrs. McPeake to survey the property in dispute. Mr. Beckham testified that he handled the "actual field work" for the survey with a three-man crew, and he assisted the licensed surveyor in "working up" the data. Mr. Beckham testified that the McPeakes told him at the outset that Sheppard Road had changed and that it was not originally in its present day location. Mr. Beckham said that when he began the survey work, he looked for evidence of the old road and saw the old roadbed to the south of the existing Sheppard Road. He said, "As you're driving down [Sheppard Road], you could look to the left and you could see an old road depression." Mr. Beckham explained that because old roads were not paved, they would increase in depth as time went on, leaving a defined depression. He said that he could see a depression on the ground in this area, which is why he knew that the clearing in the trees was not simply due to a utility easement.

Mr. Beckham noted that the deeds called for the eastern portion of the common boundary line to run westward along Sheppard Road until it intersected a small farm road, which the boundary line would then follow south for a short distance. Mr. Beckham testified that the existing Sheppard Road does not intersect with the small farm road, but lies a bit north of it. However, Mr. Beckham said that the old roadbed depression he found *does* intersect with the small farm road.

Again, after following the farm road south for a short distance, the deeds called for the common boundary line to continue westward.[3] According to Mr. Beckham, this section of the boundary line should also be located further south than where the Dicksons contend the line exists. Mr. Beckham testified that when he went to track this section of the line, he found remnants and pieces of an old and delapidated wire fence that had been there for quite some time, which ran under the ground in some places. Mr. Beckham testified that it appeared to him that the land was contained by this fence and that the fence was the obvious boundary line. He conceded that the fence did not begin near the small farm road, and that the first piece of fence was found approximately 400 feet away from the farm road. However, he said that he found numerous pieces of fence beyond that point, running for most of the length of what he believed to be the boundary line. Mr. Beckham testified that he found an old angle iron about two inches tall sticking out of the ground near the end of the

_____

[3] The dispute between the parties centers on whether Sheppard Road has been relocated, which directly affects the eastern portion of the boundary line between the properties. However, after following Sheppard Road, the deeds called for the boundary line to go south a certain distance and then continue westward. Therefore, if the true location of Sheppard Road is further south, then the remainder of the disputed boundary line would be moved further south as well, into an area which the Dicksons claim belongs to Edna.

wire fence. He explained that an angle iron is a commonly used survey marker. However, Mr. Beckham acknowledged that the angle iron was "not completely all the way over to the boundary line of the [neighboring property owner] over there where it should have been," so that his version of the disputed boundary line continued on past the angle iron. Mr. Beckham also acknowledged that the fence ended at the angle iron, so that there was no fence along the westernmost portion of his version of the boundary line.

The next witness to testify was Devon Acheson, who was a licensed surveyor also employed by Reasons Engineering & Associates. He took over responsibility for completing the survey work that Mr. Beckham began. Mr. Acheson produced a large map, dated 1950, that depicted a portion of Henderson County.[4] Mr. Acheson testified that the 1950 map appears to show Sheppard Road intersecting with the farm road. He testified that based upon his work on the ground, he concluded that the farm road does not intersect with the current Sheppard Road, as the current Sheppard Road lies approximately 150 to 200 feet north of the beginning of the farm road.

It is undisputed that a school bus turnaround loop was constructed in this area of Sheppard Road, near the farm road, in the 1960's, because the Dickson children were the last ones to be picked up on Sheppard Road. The turnaround loop circles down to the south of the existing Sheppard Road, toward Edna Dickson's house, and then reconnects with Sheppard Road at a point further down the road. The land encircled by the loop consists of approximately 0.9 acres. Mr. Acheson testified that the small farm road "comes into," or connects with, the lower western side of the paved turnaround loop, and that the turnaround loop then intersects with the existing Sheppard Road. Although Mr. Acheson testified that the farm road does not intersect with the existing Sheppard Road, he conceded on cross-examination that he did not know if, prior to the construction of the turnaround loop, the farm road may have continued on through that area to connect with the existing Sheppard Road. In other words, he acknowledged the possibility that a portion of the farm road was paved over and became the side of the loop.

Mr. Acheson also produced an updated version of the previously discussed 1950 map, which was revised and edited in 1991. The map legend states that revisions to the map were depicted in purple and made based on aerial photographs taken in 1985, in addition to other sources. Mr. Acheson testified that Sheppard Road was depicted in purple on the map, which indicated that the road was in a different location than on the 1950 map. He placed a circle on the 1991 map to indicate the area of Sheppard Road that had been changed. On cross-examination, Mr. Acheson was questioned regarding whether the precise area of Sheppard

---

[4] This map was created by the Tennessee Valley Authority and published by the United States Geological Survey.

Road that is in dispute was actually colored in purple on the map, and Mr. Acheson conceded that he could not really tell whether it was depicted in purple because he is color blind.[5]

Mr. Acheson testified that a 1967 survey of a neighboring parcel proves that Sheppard Road was in its *current* location in 1967. However, he explained that none of the deed descriptions prior to that time described the precise location of the road. For example, one of the 1946 deeds at issue stated that the boundary line would run "with the meanders of" the road. Mr. Acheson opined that the cleared area south of the existing Sheppard Road, where the power lines run, was the location of the old roadbed. He explained that he did not believe the area to be a simple utility easement, because although a utility easement would be cleared of trees and brush, it would not have a depression typical of an old roadbed. Mr. Acheson suggested that the road was probably relocated sometime between 1950 and 1967. He testified that a 1938 map depicted Sheppard Road as "totally different" than the maps from 1950 and later years. Mr. Acheson conceded that the existing Sheppard Road is curvy, and his designation of the old Sheppard Road is a straight line, which suggests that if the road was relocated, as he contends, a curve was actually inserted into an otherwise straight section of road. Mr. Acheson said that the old roadbed is straight, but that the actual old road could have had some curves, if they fell within the straight roadbed.

Mr. Acheson testified that the old roadbed continued westward and crossed through the center of the school bus turnaround loop before intersecting with the southbound farm road. As a result, Mr. Acheson opined that the land in the center of the turnaround loop was divided, with Mrs. McPeake owning the northern portion of the "island" and Mrs. Dickson owning the southern part.

Regarding the western portion of the boundary line, which extends westward from the farm road, Mr. Acheson said that he was able to identify the line due to the remnants of the old wire fence and the angle iron. He opined that Mrs. McPeake owned the area north of the fence, and Mrs. Dickson owned the area south of the fence. He conceded that the deeds did not mention a fence, but he said the fence substantiated that his version of the line was at the correct location. Mr. Acheson described the fence as "not an existing standing fence," but pieces and remnants of fence, extending along portions of the boundary line, in trees and mostly lying on the ground. He conceded that the fence did not run in a straight line but meandered among the trees, while the deeds simply called for a straight line running westward. Mr. Acheson said he did not see any other intersecting fences. Regarding the eastern end of the fence, nearest the farm road, Mr. Acheson said that part of the fence

---

[5] From our review of the 1991 map, it appears that one section of Sheppard Road is depicted in purple, but it is east of the area in dispute, and the portion of the road that is relevant to this appeal is depicted in black or gray.

appeared to have been pushed up with farm equipment, and he was "quite positive" that at one time the fence had extended further east. Regarding the western end of the line, he admitted that there were no more pieces of fence beyond where they found the angle iron, and yet he extended the boundary line past the angle iron because the deeds did not call for an angle.

At the west end of the common boundary line, the McPeake deed called for the western boundary of the McPeake tract to extend north "about 12 poles" to meet back at the Sheppard Road. Twelve poles would equal 198 feet. However, because Mr. Acheson's plat had placed the common boundary line further south along the fence line, the western boundary on his plat actually extended 523.8 feet before reaching the road. Mr. Acheson acknowledged this discrepancy but said that, in his professional opinion, the monumentation on the ground, such as the old roadbed, the farm road, and the wire fence, dictated the location of the common boundary line rather than the deed's unreliable distance calls.

Mr. Acheson pointed out that Mrs. McPeake's deed stated that she owned, "by estimation, about 75 acres." He said that according to his survey, the McPeake tract was 75.9 acres. Mr. Acheson claimed that under the survey prepared by the Dicksons' surveyor, Mrs. McPeake's tract would only contain 67.19 acres. He explained that there was a discrepancy of 5.61 acres due to the surveyors' different opinions as to the common boundary line between Mrs. McPeake's tract and Mrs. Dickson's tract. In other words, the area claimed by both Mrs. McPeake and Mrs. Dickson consisted of about 5.6 acres. The remainder of Mrs. McPeake's "lost acreage" under the Dicksons' survey was due to differences regarding the location of boundaries between the McPeake tract and other neighboring landowners.

Mrs. McPeake's husband, Jerry McPeake, also testified at trial. He was born in 1938 and testified that he played ball and hunted in the area around Sheppard Road as a boy. Mr. McPeake testified that he remembered a road running through this area in a general east/west direction around the 1950's, and the road he recalled was not in the same location as the present day Sheppard Road. Mr. McPeake said the old road was "more of a straight road" and did not have "that bend." Mr. McPeake described the old road as graveled for about 100 feet past the old schoolhouse, then continuing on as a dirt road that was not maintained. He testified that the depression of the old roadbed is still visible, and that power lines now run along the edge of the old road. Mr. McPeake testified that the old roadbed meets the farm road, but the farm road does not meet the existing Sheppard Road, although it does meet the school bus loop. He said the old farm road goes generally southward and leads into the field behind Mrs. Edna's house.

Mr. McPeake said that he could remember the fence at issue from when he hunted in the area as a boy, and he said that at that time, it was a standing fence and "in a lot better

shape." He also described the fence as "straight as a bullet." Mr. McPeake said that after his wife bought the property, he hired a paper company around 1994 to clear cut the trees on the property in that area, all the way down to the location of the remnants of the old fence, and no one tried to stop them from cutting.

Mr. McPeake testified that after his wife bought the property, they also hired a surveyor to survey the common boundary line between her property and the Dicksons' property, and that surveyor was Eddie Coleman.[6] According to Mr. McPeake, Mr. Coleman walked the line with him and told him that the property line followed along the existing Sheppard Road. Mr. McPeake said that he told Mr. Coleman at that time that there was an old roadbed to the south of the existing Sheppard Road, but Mr. Coleman said that he was not concerned with the old road. Mr. McPeake claimed that Mr. Coleman also told him that the western portion of the common boundary line followed along the old fence. Mr. McPeake said that Mr. Coleman never gave him a plat or written document evidencing his survey. When asked how Mr. Coleman's survey allegedly connected the existing Sheppard Road with the fence much further south, Mr. McPeake said he "come around in a circle" to connect them.

Mrs. McPeake was unavailable at trial, but she testified by deposition and stated that she recalled walking along the boundary line with Mr. Coleman, and that Mr. Coleman said that the boundary line followed the old wire fence. Mrs. McPeake's son-in-law, Robert Thurston, Jr., testified at trial and said that he was also present to witness the survey by Mr. Coleman in 1994. He also said that Mr. Coleman marked the common boundary line as coming down the existing Sheppard Road, and following along the old wire fence. Mr. Thurston said that while he was present, no one said anything about the road having moved.

Mr. McPeake's first cousin, Larry Joe McPeake, testified as well. He said that he first became familiar with the area in dispute around 1955 because his father farmed and hunted in the area, and he also played ball in that area as a boy. Larry Joe McPeake testified that he remembered going to the area on one occasion and noticing that Sheppard Road had been rerouted. He testified that on another occasion when he returned to the area, he noticed that there were power lines running down the old roadway. When asked when the road changed, Mr. McPeake replied, "I can't say exactly. I just know it happened." He said he recalled the school bus turnaround loop being constructed around 1959, 1960, or 1961, and he thought that Sheppard Road was relocated at that same time. He explained, "Well, here's what happened. When I – when you leave the Center Hill Road and go westward down Sheppard Road, when you got up to the point of the hill, the old road went this way, but the new road

_____

[6] More recently, Mr. Coleman had surveyed the disputed boundary line for the Dicksons, and he testified for the Dicksons at trial.

had been routed this way, and a loop was made at the end."

After the presentation of Mrs. McPeake's proof, numerous witnesses were called by the Dicksons. Mr. Joe Keen, who was 82 years old, testified that he had lived on Sheppard Road since 1954, and that the road had not moved or been relocated during that time. Mr. Keen lived approximately one mile from Mrs. McPeake's property. Seventy-six year old Dennis Dyer testified that he was familiar with Sheppard Road because he lives in that area, he was born and raised there, and because he worked for the Henderson County Road Department for 32 years. Mr. Dyer said that Sheppard Road had never been located further south or otherwise changed location, stating, "It's just like it's always been." Although Harold Hensley did not testify at trial, the parties stipulated that he would testify that he had been a road commissioner for Henderson County since 1965, that Sheppard Road had not been located anywhere other than its current location during that time, and that he had no knowledge of any changes in its location ever occurring.

The next witness to testify was Danny Dickson, Edna's son, who had joined her counterpetition as a third-party plaintiff because he also owns property affected by the disputed boundary line. Danny Dickson testified that he was born in 1953 and grew up on the property that his parents had purchased in 1946. His parents had deeded a portion of their property to him in 1978 so that he could build a house thereon. Danny's property lies along the existing Sheppard Road, and the alleged old roadbed crosses over a portion of his property.

Danny Dickson testified that the school bus turnaround loop was constructed around 1966 or 1967 so that the bus would no longer have to back out of the Dicksons' long driveway. He explained that the Dicksons' long driveway to their house was actually the small farm road referred to in the deeds. He said the farm road continued on past his mother's house, but it was used as the Dicksons' driveway. Mr. Dickson said that prior to the construction of the loop, the farm road connected with Sheppard Road, but that section of the farm road was paved to form the turnaround loop. Mrs. Dickson's house is now located near the "bottom," or southern portion, of the loop.

Danny Dickson testified that he remembered when Mr. Coleman surveyed the property for the McPeakes around 1994, and that he was in agreement with where Mr. Coleman hung ribbon and marked the boundary line. However, Danny testified that the line surveyed by Mr. Coleman did not follow along the old wire fence, as alleged by Mr. McPeake. Danny testified that prior to this lawsuit arising, he was aware that there were bits and pieces of fence wire in the woods because he had stumbled upon them. However, he testified that he did not know of the fence as a boundary fence, and he did not know who built the fence. He said that there are fences all over the property. Danny testified that there

are actually four fences in that area, and that some intersect at right angles with the fence at issue. He said the fences run "in every different direction" and appear to make a pen or rectangle, as one fence ran parallel with the fence at issue, several hundred feet away. He also explained that there are no fence posts in the area, and all of the fence wire is simply attached to trees. He produced photographs of the fence wire, with orange ribbon tied to it in order to make it more visible, and the photographs depict different sections of the fence running in different directions in the background.

Danny also testified that Jerry McPeake did not "clear cut" timber all the way to the fence, as he had claimed. Danny said that the clear cutting stopped at where he understood the boundary line to be. He conceded that Mr. McPeake had harvested *some* timber on what the Dicksons claimed was their property, up to the fence, but he said that the timber cut on their property appeared to have been "select cut." Danny explained that the area is not visible from Mrs. Dickson's house, and that during the time when the timber was cut, he was not at home because he was working and his mother was physically unable to go into the woods. Danny said he "had no idea," and no reason to suspect, that Mr. McPeake had cut timber on the Dicksons' property. Danny produced a photograph that he claimed depicted his grandson standing beside a large tree on the north side of the fence where Mr. McPeake claimed to have clear cut the timber.

Regarding the alleged location of the old roadbed, Danny testified that his family and others had ridden four-wheelers and jeeps along the power line right-of-way. He testified that although the area in question is cleared of trees for about 40 to 50 feet from treeline to treeline, the "tracks" are no wider than a four-wheeler.

Mrs. Edna Dickson was in ill health and unavailable to testify at trial, but her deposition testimony was presented. She said the Sheppard Schoolhouse Road referred to in her deed was "still the road that we all use." She testified that she had lived on Sheppard Road her entire life, that the road had never been moved, and that the only change to it was the addition of the turnaround loop. Mrs. Dickson testified that she had not seen the fence in the woods because she is physically unable to walk around the property and see such things, but that she had never known of a fence in the area near the loop.

Bridgette Dickson testified that she had intended to build a house on the 0.9 acre parcel inside the turnaround loop, but that her plans were halted due to the filing of this lawsuit. She testified about various expenses she had incurred due to her inability to proceed with the construction of her house.

The next witness to testify for the Dicksons was Steve Deaton, who was employed by Coleman & Associates Surveying as a survey party chief. Mr. Deaton had graduated from

the Defense Mapping School and the Defense Mapping Agency's Advanced Imagery Analysis course. He explained that the Defense Mapping Agency is a branch of the United States Armed Services that facilitates the operations of the United States military. He had served overseas as a supervisor of analysis and synthesis terrain teams. Mr. Deaton explained that he would identify major and minor supply routes in order to move military units across prepared or unprepared roads. In that regard, he was trained to look at remote sensed imagery, including aerial photographs, in order to identify the natural features as well as manmade infrastructures in the area, including roads, bridges, supply routes, etc., and to determine the condition of such features and how they could be utilized. After Mr. Deaton became employed by Coleman & Associates Surveying, he had assisted Mr. Coleman in surveying the property at issue in this case. The trial court recognized him as an expert in his field, over the objection of counsel for Mrs. McPeake.

Mr. Deaton testified that he disagreed with the testimony of Ms. Reddin, the 911 Director who had opined that the aerial photographs she found depicted an old roadbed lying south of Sheppard Road. Mr. Deaton explained that a traveled way that has evolved over time will have a meandering pattern because in the early days of travel, travelers would take the easiest route to get to a location, not necessarily a straight line route, because that would generally require traveling across, through, and over obstacles. Mr. Deaton testified that the aerial photographs produced by Ms. Reddin showed several clearly identifiable traveled ways, while the cleared area south of Sheppard Road was a very direct, very straightforward route that was uncharacteristic of the other traveled ways in the area. He stated that the cleared area was a more direct route typical of the installation of a power line, water line, or gas line, but not characteristic of a traveled way that had evolved over time, as all of the other traveled ways in the photograph were depicted.

Next, Mr. Deaton testified about several of the maps that had previously been introduced as exhibits, in addition to other documents as well. He testified that he had a paper copy of the 2002 Henderson County general highway map, with a clear acetate copy of the 1938 general highway map overlaid onto the paper map, and he said that "clearly the location of the traveled way is in the same location" in both maps, with the exception of the addition of the turnaround loop.[7]

Mr. Deaton also testified about the revised TVA/USGS map, which allegedly showed that the road had changed between the date of the original map in 1950 and the revised map

---

[7] Mr. Deaton later conceded that the 1938 map was different in some respects than all of the other maps and photographs that were available. However, he explained that, being a handdrawn map, the 1938 map likely contained errors because the photographs would show a true depiction of the area, and no other piece of physical evidence that was available supported the different features shown in the 1938 map.

in 1991 due to the road being depicted in purple.  Mr. Deaton testified that the area shown in purple was east of the area in dispute.  He testified that the 1991 map showed that the main portion of Sheppard Road was in the same configuration as in 1950, with no significant change in its pattern.

Mr. Deaton also testified about several more aerial photographs that had been obtained from TVA.  One of those photographs was taken in December 1946, and it showed the relevant portion of Sheppard Road.  Mr. Deaton pointed out that in the 1946 photo, there was no deforested area running south of Sheppard Road, where the "old roadbed" allegedly existed.  There were no power lines in that area either, and it appeared to Mr. Deaton to be a field.  In any event, the 1946 photograph did not depict a road other than the present-day Sheppard Road.  Mr. Deaton discussed another aerial photograph from 1967, also obtained from TVA, which did show the deforested area lying south of Sheppard Road, in addition to the school bus loop.  However, he testified that a comparison of the 1946 photo and the 1967 photo consistently show Sheppard Road in the same location throughout that period of time.  He also explained that these photographs demonstrated that the deforested area appeared sometime after the 1946 photograph was taken.  In sum, Mr. Deaton opined that the evidence from 1946 forward proved that the location of Sheppard Road had not changed since 1946, and there was no evidence of a road being in the location of the existing power lines.

Next, Mr. Coleman testified about his surveys of the property in question.  He explained that he had performed survey work for both the McPeakes and the Dicksons.  He had surveyed the common boundary line for the McPeakes when Mrs. McPeake purchased the property in 1993.  He had performed a survey for Bridgette Dickson around 2006, when Edna conveyed the 0.9 acre parcel inside the turnaround loop to her, and thereafter, he surveyed Edna's property in its entirety.  Mr. Coleman testified that when he surveyed for the McPeakes in 1993, he measured the boundary line as following along the center of the existing Sheppard Road, and the McPeakes did not suggest that this was error or that the road had been in any other location.  Mr. Coleman said that there was no need for him to prepare a plat when he surveyed the property in 1993, because he discussed his findings with the McPeakes and Dicksons at that time, and they all agreed as to the location of the boundary. Mr. Coleman testified that he did not know there was a dispute until after he surveyed the "island" for Bridgette, when Mr. McPeake contacted him to say that he thought the road might have been relocated and wondered if he might have an ownership interest in the turnaround loop.

Mr. Coleman said that he had "thoroughly examined every inch" of the power line area looking for characteristics of an old road, and he found none.  He said there were no road banks, shoulders or side ditches, and at the locations where there are two "hollows" in

the area, there is no evidence of any means of conveying water from one side of the "road" to the other, and no bridge. Mr. Coleman said that if the area was an old roadbed, one would expect to find gravel or something to sustain its base, and the area should be somewhat level rather than "5 foot higher on one side than the other, and it certainly wouldn't go 100 feet and change elevations 20 feet," with gullies and hollows along the way. In short, Mr. Coleman said he found no evidence of a road existing in that location, and he found "absolutely no evidence, none whatsoever," to suggest that Sheppard Road had been in any location other than where it currently exists.

Mr. Coleman also testified that his 1993 survey had no tie with the old wire fence. Mr. Coleman testified that there were several fences in the area, but something unique about the fencing was that there were no fence posts, and all of the fencing was nailed to trees. He described it as meandering "every which way." Mr. Coleman testified that ordinarily a boundary line fence will be erected with fence posts. He also described several other "criteria" that he considers when determining whether a fence marks a boundary line. First of all, he said that the fence must be in the general proximity of where the deed calls for the boundary line to run. Second, Mr. Coleman said that the fence needs to run in the general course bearing that is called for in the deed. For example, he stated, if a deed calls for a line to proceed north, and there is a fence in the general proximity that runs north, Mr. Coleman said that he would give that fence consideration as a boundary marker. Next, Mr. Coleman testified that a boundary line fence will usually establish limits of possession, meaning that each party's "possession activities" extend to the fence and stop. Finally, Mr. Coleman testified that he considers the "monumentation" of the fence, or whether the act of building it declared openly and notoriously that the builder thought that was the location of the boundary line. Mr. Coleman said that he did not find any of these criteria present in this particular case. Instead, he said the fence was some 350 feet from the nearest perimeter line, with no pattern to the fence that would indicate someone tried to create a straight line, and no signs of "a long-term possession." Mr. Coleman said this fence was in the middle of the Dickson property. He also noted that none of the deeds mentioned a fence. Mr. Coleman acknowledged that angle irons were used in the old days like a corner monument or to mark pins that were set, but he said he "absolutely" disregarded the angle iron along the old fence line as having any bearing on the boundary, because it was 350 feet from the deed corner, out in the woods owned by the Dicksons.

According to Mr. Coleman, there had been seven surveys performed over the years, which were relevant to the property in dispute. Mr. Coleman had completed three of those surveys, and four other surveys, of neighboring parcels, had been completed by three other surveyors, dating back to 1967. Mr. Coleman testified that if the survey prepared by Mr. Acheson, Mrs. McPeake's surveyor, was correct, then all seven of the other previous surveys were incorrect.

Some other witnesses testified as well, but their testimony does not bear repeating for purposes of this opinion. The trial court's order, entered on March 31, 2011, states that the chancellor also viewed the property area in dispute in the presence of the parties and the surveyors for each side. The order states that the chancellor "went out and viewed the cut-through and rode over it, end to end, and must say that it [was] unable to see any evidence that a road was once there." After noting many conflicts between the parties' evidence, the trial court's order stated that the court was "more persuaded by" the Dicksons' proof and evidence. As such, the court ruled that the boundary line would be established as set forth in Mr. Coleman's survey plat. The court dismissed the complaint filed by Mrs. McPeake and granted judgment for the Dicksons on their counterpetition, awarding $16,156.50 to Bridgette for expenses she incurred after she was enjoined from completing her house, and awarding $5,800 to Mrs. Dickson for the value of timber cut on her property by the McPeakes. Mrs. McPeake timely filed a notice of appeal.

## II. ISSUES PRESENTED

On appeal, Ms. McPeake presents the following issues for review:

1. Did the trial court err in failing to address the issue of adverse possession, which was raised in the complaint and addressed during witness testimony;
2. Did the trial court in essence base its findings of fact primarily on the testimony of Danny Dickson and the Dicksons' surveyor, Eddie Coleman; and
3. Did the documentary evidence establish by a preponderance of the evidence that Sheppard Road had been relocated.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2011); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). "When issues of credibility and weight of testimony are involved, we afford considerable deference to the trial court's findings of fact." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010) (citing *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007)). "Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary." *Hughes v. Metro. Gov't of Nashville &*

*Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011) (citing *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).  We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness.  ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV.  DISCUSSION

### *A.  Adverse Possession*

On appeal, Mrs. McPeake argues that the trial court erred in failing to address the issue of adverse possession.  She points out that her complaint alleged that even if she was not the legal owner of the disputed property, she nevertheless owned a portion of the property by virtue of adverse possession pursuant to Tenn. Code Ann. § 28-2-101, et seq.  Mrs. McPeake contends that the testimony of various witnesses that she "clear cut" timber on the property in dispute around 1994 demonstrates adverse possession.  Mr. McPeake testified that he had not done anything on the disputed property since he cut the timber there around 1994, but nonetheless, Mrs. McPeake argues that "clear cutting" timber constitutes notice to the world of an adverse claim, and therefore, a single act of "clear cutting" was sufficient.[8]  In response, the Dicksons claim that the trial court rejected the adverse possession argument because it found that the McPeakes did not "clear cut" the property at issue.

From our review of the record, it does not appear that the issue of adverse possession was mentioned during the four-day trial.  However, various witnesses did testify about the timber cut in the disputed area, and the trial court's order addressed this testimony as follows:

> Mr. Acheson also opined that another indication of the "old fence" being the line was that Edna Dickson acquiesced in McPeake cutting timber to, or in the area of, that fence.  Danny Dickson rebutted this by his testimony that the timber was not "clear cut" as described by McPeake to the old fence, but that it was more of a "select cut" and he did not know McPeake was cutting it, he being gone, and his mother, Edna Dickson, was elderly and not able to go into the woods. . . .

Mrs. McPeake argues on appeal that the trial court's finding was in error, because, according to Mrs. McPeake, Danny Dickson conceded at trial that McPeake did "clear cut" the area in

---

[8]  On appeal, Mrs. McPeake's adverse possession argument hinges on whether she and/or her husband did in fact "clear cut" the property in dispute.  She does not argue that adverse possession would be established by cutting select trees or by any other action that she took with respect to the property.

question. Mrs. McPeake claims that the trial court "misquoted" the trial testimony. We disagree with this assertion. Danny Dickson testified at trial that the McPeakes did *not* clear cut up to the fence line, as Mr. McPeake had claimed in his testimony. When asked to identify on a map the location where the clear cutting occurred, Mr. Dickson stated, "It's hard for me to tell." However, he emphasized that the clear cutting stopped at where he understood the boundary line to exist. Mr. Dickson said that the cutting that took place on the Dickson property near the fence was a select cut, meaning not all trees were removed. He produced a photograph of a large tree which, he testified, is still standing on the side of the fence where the McPeakes claimed to have clear cut. On cross-examination, Danny Dickson was again asked to identify on a survey plat which area was clear cut and which area was select cut. At first, he again identified the two separate areas, but later, he said, "I think that was – I think that was clear cut, too, from here to here." He asked for the next question on the issue to be reworded and indicated that he did not understand. When questioned further on re-direct, Danny apologized and said again that he was confused. He then clarified that the disputed area was not completely clear cut, and that some trees remained in that area. The trial court clearly considered Danny's testimony in its entirety and concluded from his testimony that the disputed property was not clear cut. The evidence does not preponderate against this finding.

Because we find no error in the trial court's finding that the McPeakes did not clear cut the property in dispute, it is not necessary for us to address Mrs. McPeake's assertion that a single instance of clear cutting is sufficient to establish adverse possession.

### B.    *Witness Credibility*

The next issue raised by Mrs. McPeake on appeal, as stated in her brief, is, "Did the trial court in essence base its findings of fact primarily on the testimony of Danny Dickson and Defendant[s'] surveyor, Eddie Coleman, to the exclusion of other witnesses whose testimony was unchallenged?" As previously noted, the trial court's order stated that the court was "more persuaded by the [Dicksons'] proof and evidence." In several instances, after summarizing the testimony of the McPeakes and their witnesses, the court explained how the McPeakes' evidence was rebutted or disputed by the testimony of Danny Dickson. The court also adopted the survey plat prepared by Mr. Coleman rather than the plat prepared by Mr. Acheson. Thus, it does appear that the trial court relied heavily on the testimony of Danny Dickson and Mr. Coleman in reaching its findings of fact. However, we cannot say that this was error. We find no merit in Mrs. McPeake's suggestion that the testimony of her witnesses was "unchallenged." There were considerable differences of opinion on many different issues throughout the four-day trial. The trial court was able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, and therefore, we will not overturn its assessment of credibility absent clear and convincing evidence to the

contrary. *Hughes*, 340 S.W.3d at 360. We find no such contrary evidence in the record before us, and in fact, we find the testimony of Mr. Coleman and Mr. Dickson quite convincing.

### C.    The Weight of the Evidence

Finally, Mrs. McPeake argues on appeal that the documentary evidence presented, including the maps, aerial photographs, and deeds, established by a preponderance of the evidence that Sheppard Road had been relocated in order to build the turnaround loop, thus affecting the boundary line at issue. Again, we must respectfully disagree. We will not belabor this opinion by reproducing the lengthy summarization of testimony already included herein. We briefly note, however, that several *disinterested* witnesses testified at trial that Sheppard Road had never been moved, while the witnesses testifying to the contrary were mostly related to Mrs. McPeake. Moreover, the trial judge personally observed the location in question and was "unable to see any evidence that a road was once there." Mr. Deaton, who was highly trained and experienced in identifying roadways from aerial photographs, testified that the deforested area south of Sheppard Road was not characteristic of a traveled way, but more like a power line easement. He also produced an aerial photograph, as opposed to a map, from December 1946, which showed that in 1946, Sheppard Road was in its present-day location, and the deforested "roadbed" area did not even exist at that time.

Mrs. McPeake made much of the fact that the farm road does not intersect with the existing Sheppard Road. However, the trial court found, and the evidence suggests, that in the past, the farm road did intersect with Sheppard Road, and that portion of the farm road was paved when the turnaround loop was constructed.

We note that we are also unpersuaded by the suggestion that the old wire fence constituted the western half of the common boundary line. There were no fence posts in that area, the fence wire meandered back and forth through the woods, and it did not extend to either corner, or end, of the line that it allegedly marked. While the deeds called for this section of the line to proceed westward, the fence, according to the survey plat prepared by Mr. Acheson, appears to extend somewhat toward the southwest. The fence was also some 350 feet from the nearest perimeter line, according to Mr. Coleman. The deeds did not mention a fence, but one deed did provide a distance call for a line extending from the road south to that corner of the common boundary line, and the distance call was much shorter than the distance to the fence. In addition, the survey plat relied upon by Mrs. McPeake conflicted with seven previous surveys, by four different surveyors.

Having reviewed the entire record in this case, including the documentary evidence such as maps, photographs, and deeds, in addition to the testimony presented, we conclude

that the trial court's decision to adopt the survey plat prepared by Mr. Coleman is supported by the preponderance of the evidence. The weight of the evidence does not support a finding that Sheppard Road was relocated.

## V.   CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed. Costs of this appeal are taxed to the appellant, Marie McPeake, and her surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.
